**WILLISTON BASIN INTERSTATE PIPELINE COMPANY,**
Petitioner,

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Colorado Interstate Gas Company,
et al., Intervenors.**

Nos. 93–1420, 93–1706 and 94–1053.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 9, 1997.

Decided June 20, 1997.

Robert T. Hall, III argued the cause, for petitioner. With him on the briefs were Brian J. McManus, John R. Schaefgen, Jr., Washington, DC and Paul K. Sandness, Bismarck, ND. James K. Mitchell, Washington, DC, entered an appearance.

Patricia L. Weiss, Attorney, Federal Energy Regulatory Commission, argued the cause, for respondent. With her on the brief were Joseph S. Davies, Solicitor, and Susan J. Court, Special Counsel. Timm L. Abendroth, Attorney, Washington, DC, entered an appearance.

Alan J. Roth, Washington, DC, argued the cause and filed the brief, for intervenors. Douglas D. Eidahl, Pierre, SD, and Martin C. Jacobson, Helena, MT, entered appearances.

Before WALD, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

In the era when it operated primarily as a gas merchant Williston Basin Interstate Pipeline Company held a considerable supply of natural gas in storage to meet its custom-

ers' peak winter needs. Part of this was "cushion" gas, which evidently is not ever recoverable, and part, some 20 billion cubic feet ("Bcf"), was "working gas," which is. The average cost of the gas was about 47.5 cents per thousand cubic feet ("Mcf"), far below current levels.[1] As a result of the Federal Energy Regulatory Commission's Order No. 636,[2] restructuring the natural gas industry, Williston sharply reduced its gas sales operations. For its restructured functions, it needed only about three Bcf of working storage gas, leaving 17 Bcf redundant. Williston sought permission to sell the gas at market prices and keep the profit.

After a good deal of dithering, FERC decided that Williston should sell the gas to its former sales customers at cost. See *Williston Basin Interstate Pipeline Co.*, 62 FERC ¶ 61,144 (Feb. 12, 1993) (allowing Williston to sell the gas at market prices and keep the proceeds); *reh'g granted*, 63 FERC ¶ 61,184 (May 13, 1993) (allowing Williston to sell the gas at market price but requiring it to credit the gain to Williston's restructuring transition costs, i.e., to offset burdens imposed on customers); *modified on reh'g*, 64 FERC ¶ 61,297 (Sept. 17, 1993) (requiring Williston to sell the gas to its sales customers at cost) ("Sale–at–Cost Decision"); *reh'g denied*, 65 FERC ¶ 61,334 (Dec. 16, 1993). The Commission noted that in prior decisions, involving *high*-priced gas rendered redundant by restructuring, it had required customers to suffer the loss. Sale–at–Cost Decision, 64 FERC ¶ 61,297, at 63,129. Further, it noted that in the single other case where *low*-priced gas was rendered excess, it had ordered the gas sold to customers at cost. *Id.* In addition, it found its disposition "consistent with" the 1985 settlement under which Williston had acquired the storage gas from an affiliate, and also "consistent with" the proposition "that customers which have his-

torically borne the burden of utility operations should share in any benefits resulting therefrom," citing in support of that principle our decision in *Democratic Central Comm. of D.C. v. Washington Metro. Area Transit Comm'n*, 485 F.2d 786, 806 (D.C.Cir.1973). Sale–at–Cost Decision, 64 FERC ¶ 61,297, at 63,130.

\* \* \*

We begin with the settlement agreement. The Commission argues that the agreement supports the notion that the customers should receive the profits, pointing to a passage in the agreement's explanatory statement:

> Thus, as a result of the corporate realignment, Williston's customers will receive yet another benefit, in the event of a net decrement to storage, in that Williston will be able to sell such volumes at a reduced average unit price.

*Quoted in* 63 FERC ¶ 61,184, at 62,236 n. 36. On its surface, this appears to refer simply to the fact that net drawdowns from storage would be at the average price of 47.5 cents per Mcf—evidently more favorable to customers than LIFO pricing, under which customers would first be charged the higher prices of later-acquired gas. At oral argument, however, it was suggested that normal operations would not involve *any* net drawdown from storage, so that the passage necessarily refers to some sort of drastic change, such as the disposition here of nearly all of Williston's working storage gas. Neither of the parties gives us enough of the context for us to decide whether the Commission's view might be entitled to deference. See *National Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1569–71 (D.C.Cir.1987). We can pass over the issue, however. The Commission did not really rely on the settlement agreement, but only found that its ruling was

1. Compare Energy Information Administration, "Monthly Energy Review (April 1997)," at Table 9.11 (giving wellhead price averages of $1.85, $1.55 and $2.25, for 1994, 1995 and 1996, respectively).

2. Order No. 636, "Pipeline Service Obligations and Revisions to Regulations Governing Self–Implementing Transportation; and Regulation of

Natural Gas Pipelines After Wellhead Decontrol," FERC Stats. & Regs. (CCH) ¶ 30,939, 57 Fed.Reg. 13267 (1992), *codified at* 18 CFR Part 284; *reh'g granted in part*, Order No. 636–A, FERC Stats. & Regs. (CCH) ¶ 30,950, 57 Fed. Reg. 36128 (1992); *reh'g denied*, Order No. 636–B, 61 FERC ¶ 61,272 (1992); *aff'd in part, rev'd in part, United Distribution Cos. v. FERC*, 88 F.3d 1105, 1188–91 (D.C.Cir.1996); *on remand*, Order No. 636–C, 78 FERC ¶ 61,186 (1997).

"consistent" with the agreement. We can uphold the Commission's decision if its reasoning is otherwise adequate.

■ Before the Commission Williston largely confined itself to argument over FERC's treatment of similar cases, and the Commission responded in kind. As it explained in its key decision here, the Commission has saddled customers with the burden of losses on storage gas rendered surplus by the current restructuring. In *ANR Pipeline Co.*, 62 FERC ¶ 61,079 (1993), the pipeline sought to bill customers for the difference between the sales price and book value of its storage gas. The Commission decided that placing this loss on non-storage customers would be unjustified, and that storage customers should bear the loss, which it effected by assigning them the gas at cost. *Id.* at 61,589; see also *Panhandle Eastern Pipe Line Co.*, 62 FERC ¶ 61,288, at 62,884 (1993) (storage customers should bear storage costs, transportation customers should not). No suggestion was made in *ANR* that such a loss should fall on pipeline investors. Rather, to the extent that the pipeline was still unable to recover its full costs through sale to storage customers, it could include them as a transition cost, subject to the eligibility and prudence requirements set forth in Order No. 636. *ANR*, 62 FERC ¶ 61,079, at 61,589; see also Order No. 636, FERC Stats. & Regs. (CCH) ¶ 30,939, at 30,458–60 (discussing eligibility and prudence review for "gas supply realignment" ("GSR") costs).

■ Williston seeks to distinguish *ANR* and *Panhandle* as "inapposite (because the storage gas was an above-market burden)," Reply Br. at 3, rather than a benefit from increases in market value. Just what argument Williston is advancing *against* symmetry is unclear. In favor of symmetry, for starters, is precedent. In *Democratic Central Committee*, we relied on the "principle that the right to capital gains on utility assets is tied to the risk of capital losses." 485 F.2d at 806. Moreover, a rule assigning the firm the benefit of good outcomes and customers the burden of bad ones, a kind of "heads I win, tails you lose" rule, would seem to give the utility's management an unhealthy incentive to gamble. Compare Jonathan R. Macey & Geoffrey P. Miller, "Bank Failures, Risk Monitoring, and the Market for Bank Control," 88 Colum. L.Rev. 1153, 1162–65 (1988) (describing risk-taking incentives that deposit insurance gives bank managers and the perverse effects of the resulting "moral hazard"). Thus, if customers are to bear the risk that a dramatic industry transformation (such as restructuring under Order No. 636) will force the realization of losses on specific asset classes, it is hard to see a reason why they should not reap benefits from forced realization of gains. Williston certainly offers none.

In fact, FERC has applied this treatment to other pipelines with low-priced storage gas. In *National Fuel Gas Supply Corp.*, 62 FERC ¶ 61,200, at 62,481 (1993), it rejected a storage gas sale proposal under which the pipeline rather than its customers would have captured the difference between the book price and the sale price. The Commission found that as a seller under a purchased gas adjustment clause ("PGA")—which continuously adjusts a pipeline's sales price to track ongoing changes in its gas costs, largely protecting it from the risk of loss due to price changes, see *Transwestern Pipeline Co. v. FERC*, 59 F.3d 222 (D.C.Cir.1995) (reviewing some of the mechanics of PGAs)—National Fuel was not entitled to keep any profit. See also *Columbia Gas Transmission Corp.*, 64 FERC ¶ 61,060, at 61,569 (1993) (pipeline not entitled to profit). Williston seeks to distinguish *National Fuel,* arguing that the pipeline there was still operating under the PGA regime, while Williston proposed a post-PGA market sale. We find nothing unreasonable in the Commission's refusal to allow such a modest difference of timing to change the outcome, and Williston offers no affirmative reason why it should do so.

FERC's approach is also consistent with the general cost allocation scheme of Order No. 636, which authorizes pipelines to bill their customers for all of their GSR costs arising from their virtual removal from the gas sales business by Order No. 636. FERC Stats. & Regs. (CCH) ¶ 30,939, at 30,457–60. Its prior decision to place these and other transition costs on the customers bolsters the

Commission's justification for allocating any seemingly parallel transition benefits to the customers.

Although we remanded part of Order No. 636 to FERC for further consideration of whether pipelines should bear some of the GSR costs, we did so only because of what we saw as contradictions in the Commission's reasoning. *United Distribution Cos. v. FERC,* 88 F.3d 1105, 1188–91 (D.C.Cir.1996). On remand the Commission readopted a rule permitting the pipelines to pass on all Order No. 636 GSR costs to their customers. Order No. 636–C, 78 FERC ¶ 61,186, at 61,779–89. Accordingly, the Commission's decision here is entirely congruent with the rest of its transition policy.

In its reply brief Williston cites a number of cases for the general proposition that when a utility whose rates are regulated under general cost-of-service principles disposes of an asset that it had held for purposes of providing service, the proceeds realized are its own, free of claims by the customers. See, e.g., *Board of Public Utility Comm'rs v. New York Telephone Co.,* 271 U.S. 23, 31–32, 46 S.Ct. 363, 366, 70 L.Ed. 808 (1926); *Duke Power Co.,* 48 FPC 1384, 1394–95 (1972) (applying *New York Telephone* to non-depreciable property), *reh'g denied,* 49 FPC 406 (1973). The customers' payment of carrying costs and depreciation is deemed to match the services they received, so that they have no legal interest in gains or losses at disposition. Had Williston raised these cases earlier in the proceedings, it would have put before the Commission the question of how to work out a fit between the general principle they embody (assuming Williston's view of them is wholly accurate), on the one hand, and the logic of a transition in which the agency generally protected utilities from the resulting losses, on the other. As it did not, however, the Commission can hardly be faulted for failing to relate its analysis here to the general principle.[3]

It may seem troubling that a pipeline that has bought gas at low prices (for reasons that may include exceptional skill in purchasing) should be denied the resulting benefit in significant part because of a FERC practice allowing others, which bought at high prices, to shunt the burden onto consumers. Williston, however, has not made out a case that it is a net loser by the Commission's overall treatment of the Order No. 636 restructuring, and indeed the intervenor calls our attention to Williston's own estimate that its compensated GSR costs are about $20 million, see 63 FERC ¶ 61,184, at 62,236, which appears to be in the same ballpark as the customers' likely gain on the 17 Bcf of storage gas.

The petition for review is

*Denied.*

---

**3.** At oral argument Williston sought to explain its tardy reference to *New York Telephone* by noting that it was not until the order forcing a sale to customers at cost that the Commission cited *Democratic Central Committee,* which to a degree raised the issue of broader principles. But the Commission only observed that its decision was "consistent with" *Democratic Central Committee,* see Sale–at–Cost Decision, 64 FERC ¶ 61,297, at 63,310, and in any event Williston failed to raise the broader principle in its petition for rehearing from that decision, Joint Appendix 75–90.